UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————
)
OAD, LLC,                                          )
)
Plaintiff,                  )
)
v.                                                 )
)          CIVIL ACTION NO. 05-10150 (RCL)
SYDNEY, INC., d/b/a OAD MIDWEST,                   )
WALSTROM GROUP, INC., GARY W.                      )
WALSTROM, and CECILIA BRUENING,                    )
)
Defendants.                 )
—————————————————)

—————————————————
)
SYDNEY, INC., d/b/a OAD MIDWEST,                   )
WALSTROM GROUP, INC., GARY W.                      )
WALSTROM, and CECILIA BRUENING,                    )
individually and derivatively on behalf of         )
OAD, LLC,                                          )
)
Plaintiffs-in-counterclaim,                        )
)
v.                                                 )
)
OAD, LLC, and MICHAEL GRAY,                        )
)
Defendants-in-counterclaim.                        )
—————————————————)


**DEFENDANTS' ANSWER TO PLAINTIFF OAD, LLC'S AMENDED COMPLAINT
AND COUNTERCLAIMS AGAINST OAD, LLC AND MICHAEL GRAY**

Defendants Sydney, Inc., d/b/a OAD Midwest ("Sydney"), the Walstrom Group, Inc. (the

"Walstrom Group"), Gary W. Walstrom ("Walstrom"), and Cecilia Bruening ("Bruening"),

(collectively, the "Defendants") hereby respond to Plaintiff OAD, LLC's Amended Complaint

(the "Complaint").  To the extent that Defendants answer any allegations therein by stating that a

response is not required to a particular statement or that Defendants are without knowledge of

the truth of a particular statement and a response is subsequently found to be required, such

allegation shall be deemed denied.  Defendants further assert the Counterclaims listed below

against OAD, LLC and Michael Gray ("Gray")  pursuant to Fed. R. Civ. P. 13(a), and join Gray

pursuant to Fed. R. Civ. P. 18(a) as a Defendant-in-counterclaim.

**Parties**

1.      Upon information and belief, Defendants admit the allegations in ¶ 1.

2.      Defendants admit the allegations in ¶ 2.

3.      Defendants admit the allegations in ¶ 3.

4.      Defendants admit the allegations in ¶ 4.

5.      Defendants admit the allegations in ¶ 5.

6.      Defendants deny the allegations in ¶ 6, except that Defendants admit that

Walstrom and Bruening are married.

**Jurisdiction**

7.      Defendants state that the allegations in ¶ 7 are either opinions or conclusions of

law to which no response is required, or are merely descriptive of Plaintiff's claims.

**Statement of Underlying Facts**

8.      Defendants deny the allegations in ¶ 8, but admit that Gary Walstrom and Michael

Gray formed OAD, LLC.

9.      Defendants deny having knowledge or information sufficient to form a belief as to

the truth of the allegations in ¶ 9.

2

10.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of ¶ 10.  Defendants deny the remaining allegations in ¶ 10.

11.     Defendants deny the allegations in ¶ 11, except that Defendants admit that Walstrom is the sole owner of the Walstrom Group.  Defendants aver that on or about July 12, 2002, OAD, LLC entered into a Master Distributor Agreement with the Walstrom Group.

12.     Defendants deny the allegations in ¶ 12.  Defendants aver that OAD, LLC and Sydney entered into a Distributor Agreement on or about July 18, 2002, and that Sydney is owned by Bruening.

13.     Defendants deny the allegations in ¶ 13.

14.     Defendants deny the allegations in ¶ 14 except that Defendants admit that Walstrom transferred his interest in OAD, LLC to Sydney, which is now owned by Bruening, and that OAD, LLC was so advised.

15.     Defendants deny the allegations in ¶ 15.

16.     Defendants deny the allegations in ¶ 16, except that Defendants admit that Michael Gray sent an email to Walstrom on November 3, 2004, the contents of which speak for themselves.

## Count One

17.     Defendants incorporate by reference their responses to ¶¶ 1-16 as set forth above.

3

18.     The first sentence of ¶ 18 sets forth conclusions of law and descriptions of Plaintiff's claims to which no response is required.  To the extent that ¶ 18 purports to set forth allegations of fact, Defendants deny those allegations.

19.     The first sentence of ¶ 19 sets forth conclusions of law to which no response is required.  To the extent that ¶ 19 purports to set forth allegations of fact, Defendants deny those allegations, except that Defendants admit that the portion of the Distributor Agreement cited is an accurate quotation from that document.

20.     Paragraph 20 sets forth conclusions of law to which no response is required.  To the extent that ¶ 20 purports to set forth allegations of fact, Defendants deny those allegations.

**Count Two**

21.     Defendants incorporate by reference their responses to ¶¶ 1-20 as set forth above.

22.     Defendants deny the allegations in ¶ 22.

23.     Defendants deny the allegations in ¶ 23.

24.     Defendants deny the allegations in ¶ 24.

**Count Three**

25.     Defendants incorporate by reference their responses to ¶¶ 1-24 as set forth above.

26.     Defendants admit that OAD, LLC is a close corporation in which Michael Gray holds 77% of the outstanding shares.  Defendants deny the allegation in ¶ 26 that Walstrom owns 23% of the outstanding shares of OAD, LLC.

{B0374375; 3}

27.     The characterization in ¶ 27 of Walstrom's fiduciary duties is a conclusion of law to which a response is not required.  To the extent that ¶ 27 purports to set forth allegations of fact, Defendants deny those allegations.

28.     Defendants deny the allegations in ¶ 28.

29.     Defendants deny the allegations in ¶ 29.

## Count Five[1]

30.     Defendants incorporate by reference their responses to ¶¶ 1-29 as set forth above.

31.     Defendants deny the allegations in ¶ 31.

32.     Defendants deny the allegations in ¶ 32.

33.     Defendants deny the allegations in ¶ 33.

## Count Six

34.     Defendants incorporate by reference their responses to ¶¶ 1-33 as set forth above.

35.     Defendants deny the allegations in ¶ 35.

36.     Defendants deny the allegations in ¶ 36.

37.     Defendants deny the allegations in ¶ 37.

---

[1] Defendants note that the Complaint has no Count Four, and refer to each count by the number given it by Plaintiff.

{B0374375; 3}

## Count Seven

38.    Defendants incorporate by reference their responses to ¶¶ 1-37 as set forth above.

39.    Defendants deny the allegations in ¶ 39, except that the contents of the Distributor Agreement as defined speak for themselves.

40.    Defendants deny the allegations in ¶ 40.

41.    Defendants deny the allegations in ¶ 41.

42.    Defendants deny the allegations in ¶ 42.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails for various reasons to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiff is barred from recovery herein by operation of the doctrine of estoppel.

### Third Affirmative Defense

Plaintiff is barred from recovery herein by operation of the doctrine of laches.

### Fourth Affirmative Defense

Plaintiffs are barred from seeking enforcement of § 13.02 of the Distributor Agreement because of the doctrine of unclean hands.

### Fifth Affirmative Defense

Plaintiffs are barred from enforcing the Master Distributor Agreement and Distributor Agreement by virtue of a prior material breach.

6

### Sixth Affirmative Defense

If Defendants owe any money to Plaintiff, which they deny, such sums have already been paid.

### Seventh Affirmative Defense

Plaintiff's claims herein are barred by the applicable statutes of limitations.

### Eighth Affirmative Defense

Plaintiff has waived some or all of the claims asserted in its Complaint.

### Ninth Affirmative Defense

The allegedly defamatory statements Plaintiff alleges were made by Defendant Walstrom were true (although he denies ever making them), truth that is a complete bar to recovery.

## COUNTERCLAIMS

### Parties

1.      Plaintiff-in-counterclaim Sydney is a Missouri corporation, with a principal place of business at 1241 West 67th Street, Kansas City, Missouri.

2.      Plaintiff-in-counterclaim Walstrom Group is a Missouri corporation with a principal place of business at 1241 West 67th Street, Kansas City, Missouri.

3.      Plaintiff-in-counterclaim Walstrom is an individual, residing in Kansas City, Missouri.

4.      Plaintiff-in-counterclaim Bruening is an individual, residing in Kansas City, Missouri.

7

5.      Defendant-in-counterclaim Michael Gray ("Gray") is an individual, residing in Massachusetts.  On information and belief, Gray resides at 168 High Street, Norwell, Massachusetts.

6.      Defendant-in-counterclaim OAD, LLC is a Massachusetts corporation with a principal place of business at 168 High Street, Norwell, Massachusetts.

## Jurisdiction and Venue

7.      This Court has jurisdiction pursuant to Fed. R. Civ. P. 13(a) over the Counterclaims because they arise under the same transaction or occurrence as Plaintiff's claims, and no independent jurisdictional basis is required.  In any event, the Court also has jurisdiction under 28 U.S.C. § 1332 over the Counterclaims asserted below because the parties are of diverse citizenship and because the amount in controversy exceeds $75,000, exclusive of interest and costs.  Venue is likewise proper under 28 U.S.C. §1391 because all Defendants-in-counterclaim are residents of this district.

## Statement of Facts

8.      Walstrom and Bruening are professionals with more than thirty-eight years' experience in personnel assessment and management training.

9.      In early 2002, Walstrom and Defendant Michael Gray entered into discussions contemplating the formation of a corporation for the purpose of publishing and distributing personnel assessment and management training materials and programs.  As a result of these discussions, OAD, LLC was formed as a Massachusetts limited liability company on July 10, 2002.  Originally, Walstrom and Gray were the sole shareholders in OAD, LLC; Walstrom held 23% of the outstanding shares, Gray held 77%.  In September, 2004, Walstrom transferred his

8

entire interest in OAD, LLC to Sydney, which currently holds the same 23% interest in the corporation.

10.    As majority shareholder in a closely-held corporation, Gray owed the minority shareholders and the corporation a fiduciary duty of the utmost good faith. Notwithstanding this fiduciary duty, Gray has engaged in self-dealing and oppression of the rights of the minority shareholders.

11.    The Walstrom Group agreed July 12, 2002 to act as Master Distributor for OAD, LLC. A true and accurate copy of this agreement is attached as Exhibit A.

12.    Sydney agreed on July 18, 2002 to act as exclusive distributor for OAD, LLC in Missouri. The agreement was valid for three (3) years. A true and accurate copy of this agreement is attached as Exhibit B.

13.    On information and belief, OAD, LLC has similar distribution arrangements with other distributors in other parts of the United States.

14.    Throughout the remainder of 2002 and 2003, the Walstrom Group and Sydney, through the efforts of Gary Walstrom, were by far the most successful distributors of OAD, LLC's products. As noted in an email from Gray to OAD, LLC's distributors on January 20, 2004, "This was OAD's worst year by far. Only Gary [Walstrom] and Gilles [Gagnon] held their own or improved sales."

15.    Similarly, in an email dated April 29, 2004, Gray sent OAD, LLC's distributors a ranking of the sales made by each distributor. As Gray noted, "Following is the ordering of sales performance by Distributor for the first three months of 2004. 1. Gary Walstrom (by far)."

{B0374375; 3}

16.     Despite Walstrom's obviously critical role in the viability of OAD, LLC, Gray persisted in trying to avoid compensating the Walstrom Group and Sydney their agreed-upon commissions.

17.     During a visit by Gray to Kansas City in November, 2003, Walstrom broached the subject of OAD, LLC's consistently delinquent payments under the Master Distributor Agreement and the Distributor Agreement.  Gray would not discuss the matter, but promised to revisit the issue "later."

18.     Throughout December, 2003, Walstrom made several further inquiries OAD LLC's payment deficiencies, but Gray ignored these entreaties.

19.     In early December, 2003, Gray finally addressed the topic and told Walstrom that there was "nothing to talk about" and that the agreements were "too expensive to pay and that the subject was history."

20.     Despite Gray's obvious bad faith, Walstrom continued to try to resolve the issue of what Sydney and Walstrom Group were owed by OAD, LLC.  Finally, Gray sent an email to Walstrom on December 16, 2003, which read:

> It is clear we cannot work together.  Consider this email as advance notice of the termination of your distributor contract.  I will check to see what the time frame is (I believe it is 30 days), but, in any event, I suggest you try and make arrangements with another test supplier.

21.     In light of Gray's threats to Walstrom's livelihood, Walstrom agreed to a new arrangement that reduced the Walstrom Group's commissions from 50% to 30%.  This commission structure was summarized in an email from Gray to Walstrom dated December 19,

{B0374375; 3}

2003. This email contained another threat from Gray to terminate Sydney's and the Walstrom Group's distribution contracts.

22.     Several days later, however, Walstrom changed his mind and informed Gray that he no longer wished to be the Master Distributor, and wanted to continue only as one of OAD, LLC's distributors. Gray acknowledged that he accepted the Walstrom Group's transition from Master Distributor to one of several distributors in an email dated January 8, 2004. This email proffered all manner of delusional and salacious accusations against Walstrom and Bruening, all of which Gray knew to be untrue.

23.     Over the course of 2004, Gray withdrew $250,000 from OAD, LLC's assets without any business justification. On information and belief, this withdrawal has been used exclusively by Gray and has never been returned to the corporation.

24.     Throughout 2003 and 2004, OAD, LLC repeatedly failed to remunerate the Walstrom Group and Sydney for their services. The Walstrom Group and Sydney finally informed OAD, LLC in September, 2004 that they would withhold receivables destined for OAD, LLC until OAD, LLC performed its contractual obligations.

25.     In spite of Defendants' consistent performance under their agreements with OAD, LLC, and in spite of his own flouting of his payment obligations to Sydney and the Walstrom Group, Gray sent an email on November 5, 2004, to Jon Lambert, a client of OAD, LLC, accusing the Defendants of "egregious contract violations."

11

26.     On information and belief, Gray sent similarly disparaging emails to several other OAD, LLC clients in an attempt to dissuade them from ever doing business with the Plaintiffs-in-counterclaim.

## Count One

### Breach of Fiduciary Duty (brought derivatively on behalf of OAD, LLC against Defendant-in-counterclaim Michael Gray)

27.     Plaintiffs-in-counterclaim incorporate by reference and reallege ¶¶ 1-26 as though fully set forth herein.

28.     As the majority shareholder of a closely-hold corporation, Gray owed the corporation and its minority shareholders a fiduciary duty to act in their best interests.

29.     Gray's self-dealing and wrongful appropriation of corporate assets violated that duty.

30.     OAD, LLC suffered damage when Gray wrongfully withdrew $250,000 of corporate assets with no business justification.

31.     Either Walstrom or Sydney was a shareholder at the time the wrongful withdrawals took place, and therefore have standing to sue on the corporation's behalf.

32.     Pursuant to Fed. R. Civ. P. 23.1, demand on the corporation would be futile because Gray, the party guilty of self-dealing, is the Managing Partner and majority shareholder of OAD, LLC.  It would therefore be futile to require the Plaintiffs-in-counterclaim to make demand upon the very party from whom it seeks recovery.

{B0374375; 3}

## Count Two

### Breach of Contract (against Defendant-in-counterclaim OAD, LLC)

33.    Plaintiffs-in-counterclaim incorporate by reference and reallege ¶¶ 1-32 as though fully set forth herein.

34.    Sydney and the Walstrom Group performed fully under the Distributor Agreement and Master Distributor Agreement, respectively.

35.    OAD, LLC breached those contracts by, *inter alia*, refusing to pay Sydney and the Walstrom Group for services rendered.

36.    Sydney and the Walstrom Group have suffered damages as a result of OAD, LLC's breach of these contracts.

## Count Three

### Accounting of Business Records (against Defendant-in-Counterclaim OAD, LLC)

37.    Plaintiffs-in-counterclaim incorporate by reference and reallege ¶¶ 1-36 as though fully set forth herein.

38.    Gray has misappropriated and wasted corporate assets, purportedly in his capacity as Managing Partner of OAD, LLC.

39.    Plaintiffs-in-Counterclaim Sydney and Walstrom are entitled to an accounting of OAD, LLC's financial affairs to determine the precise amount of all corporate assets wrongfully diverted by Gray.

{B0374375; 3}

WHEREFORE, Plaintiffs-in-counterclaim request the following relief:

A.    That judgment be entered in their favor on each of their counterclaims;

B.    That the Court award $250,000, and any other amounts the Court determines under the above-requested accounting to have been wrongfully diverted by Gray, to Plaintiff-in-counterclaim OAD, LLC, as reimbursement for the misappropriation of corporate assets by Gray;

C.    That the Court order OAD, LLC to compensate Plaintiffs-in-counterclaim Sydney and the Walstrom Group under their applicable contracts, amounting to twenty five percent (25%) of revenues collected under the Distributor Agreement and fifty percent (50%) under the Master Distributor Agreement by Plaintiffs-in-counterclaim, plus interest; and

D.    That the Court award Plaintiffs-in-counterclaim all other relief that the Court deems just under the circumstances.

> Respectfully submitted,
>
> SYDNEY, INC., d/b/a OAD MIDWEST,
> WALSTROM GROUP, INC., GARY W.
> WALSTROM, and CECILIA BRUENING

February 10, 2005

> /s/ Nicholas M. O'Donnell
> Nicholas M. O'Donnell (Board of Bar Overseers
>     Number 657950)
> nodonnell@sandw.com
> Ira K. Gross (Board of Bar Overseers
>     Number 212720)
> igross@sandw.com
> SULLIVAN & WORCESTER LLP
> One Post Office Square
> Boston, MA  02109
> (617) 338-2800

14

# EXHIBIT A

Agreement between
Organization Analysis and Design (OAD) LLC
A Massachusetts corporation

And

The Walstrom Group Inc.
A Missouri corporation

The Walstrom Group, Inc. will be the exclusive Master Distributor within the continental United States for OAD LLC, except New York State counties bordering Canada, the state of Vermont, the state of New Hampshire north of Concord, the state of Maine north of Portland. The Walstrom Group Inc. will be responsible for the active recruitment and development of New Distributors and Agents that lie outside of the territories of the Existing Distributors who are Sandra Langford, Kevin McHugh, Ray Malone, and Sydney, Inc.

1. This agreement does not preclude Existing Distributors hiring Agents or Sales Representatives to work within their own territory and/or within their own Distributorship. The Walstrom Group Inc. may assist those same Existing Distributors in training and developing Agents and Sales Representatives in return for compensation agreed upon between the Distributor and The Walstrom Group Inc.

2. Distributors, Agents, and/or Sales Representatives retained by The Walstrom Group Inc. must be prior approved by OAD LLC.

3. The Walstrom Group Inc. assumes all costs in recruiting, training, developing and managing said Distributors, Agents, or Representatives.

4. Upon approval by OAD LLC the Distributor or Agent will be trained in the OAD Program by Gary Walstrom, with a three-day subsequent training by Michael Gray of OAD LLC who will charge travel and lodging expenses to the Distributor or Agent unless a Distributorship Fee has been paid.

5. Any changes to a contract will be mutually agreed upon in advance and prior to training by Gray and prior to the New Distributor, Agent or Sales Representative performing any services or work related to OAD LLC

6. The Walstrom Group Inc. will assure OAD LLC that any and all Distributors or Agents will sign a standard Distributorship or Agent contract supplied by OAD LLC.

7. The Walstrom Group Inc. will be compensated for the recruitment, training, development and management of New Distributors in the following ways:

    a.    Receive 50% of the Distributorship Fee.

    b.    Receive 50% of the New Distributors' or Agents' payments to OAD LLC for client software, training materials, retainer fees and any future revenues that come from OAD Distributors, Sales

Representatives, or Agents that may be generated via Internet or web based technology. This compensation does not include any receipts by Bill Teten or Stuart Friedman.

c.  The monies are to be paid to The Walstrom Group Inc. upon receipt by OAD LLC from the New Distributors on a monthly basis or credited to The Walstrom Group Inc. account if unable to pay on a monthly basis. Accounts will be wholly or partially reconciled every three months.

8.  The Walstrom Group Inc. will be compensated 25% of Existing Distributors' or Agents' receipts to OAD LLC beginning January 1, 2003 in return for services described in clause 1 above. The monies are to be paid to The Walstrom Group, Inc. upon receipt by OAD LLC from the Existing Distributors on a monthly basis or credited to The Walstrom Group Inc.'s. Account if unable to pay on a monthly basis. Accounts will be wholly or partially reconciled every three months.

9.  OAD LLC agrees that any and all new products or services that it develops or purchases will also be made available to The Walstrom Group Inc.

Michael J. Gray                                July 12, 2002
Senior Partner, OAD LLC

Gary Walstrom                                  July 12, 2002
The Walstrom Group, Inc.

# **EXHIBIT B**

1

THIS AGREEMENT made as of the 18 day of July, 2002.

BETWEEN:

ORGANIZATION ANALYSIS AND DESIGN (OAD) LLC,
a company incorporated under the laws of the Commonwealth of
Massachusetts,

(hereinafter called "OAD LLC")

OF THE FIRST PART

- And-

Sydney,Inc
DBA OAD Midwest

("The Distributor")

OF THE SECOND PART

WHEREAS OAD LLC is the publisher and distributor of a personnel assessment and
management training Program known as the OAD Program, which it distributes
throughout the world;

AND WHEREAS OAD LLC has agreed to appoint The Distributor its exclusive sales
DISTRIBUTOR in the Territory of Missouri;

NOW THEREFORE THIS AGREEMENT WITNESSETH that in consideration of the
premises and the mutual covenants and promises hereinafter contained, the parties
hereto hereby covenant and agree with another as follows:

1.01        In this Agreement, unless the context indicates otherwise, the following
            terms shall have the following meanings:

            (a)    The OAD Program shall mean the personnel assessment and
            management training Program, the copyrights which are owned by Michael
            Gray, of the State of Massachusetts, U.S.A., and as presently used and
            sold by OAD LLC, a Massachusetts corporation, together with any program
            that may hereafter be developed or acquired by OAD LLC related to, in
            furtherance of, in improvement of, or in substitution for the said OAD
            Program or any part or component thereof; and

            (b) Territory shall mean the specific area with Missouri within a 200 mile



2

radius of Kansas City, a geographical area in which the Distributor shall bill a minimum of 60% of the Distributor's total OAD annual revenues, including materials, training and client service, under the terms of this agreement.

2.01    OAD LLC hereby appoints The Distributor as its exclusive distributor in the Territory, and The Distributor hereby accepts such appointment, on the terms and conditions hereinafter set forth.

3.01    OAD LLC covenants and agrees to supply without cost to The Distributor the following:

    (a)  Technical information and reports,

    (b)  OAD Program and marketing information,

    (c)  Competitor and industry information of a non-confidential nature,

    (d)  OAD Seminar and Client Agreements, and

    (e)  OAD software technical support.

3.02    OAD LLC further covenants and agrees to provide ongoing support to The Distributor during the term of this agreement, such support taking the form of, but not limited to

    (a) Updates to OAD Program software, training materials and promotional materials.

    (b) Research and validation studies to keep the OAD Survey accurate and current.

    (c) Distributor business conferences to be held from time to time at the discretion of OAD LLC for the purpose of information exchange, product and service enhancements and improving distributor performance.

    (d) Providing, on terms mutually agreeable to OAD LLC and The Distributor, OAD LLC staff for visits to The Distributor's OAD Program clients.

4.01    OAD LLC covenants and agrees to supply and ship in a timely manner to The Distributor, at published distributor prices (current prices to be found in Appendix A), the following:

    (a)  OAD scoring Program disks and Organization Surveys,

3

(b) OAD demonstration disks and Organization Surveys,
(c) OAD Management Seminar Kits and Replacement Kits,
(d) OAD program brochures.
(e) Any other materials developed by OAD LLC or Michael Gray for sale to the Distributor by OAD LLC  Future materials will include a behavioral job analysis questionnaire, a leadership effectiveness seminar.

4.02    OAD LLC, at its sole discretion, shall have the right to change its distributor prices from time to time, and shall notify The Distributor of any changes in the prices of the products or services distributed under this Agreement no later than 60 days prior to the effective date of any such change. In the event of price changes due to causes other than cost increases and inflation, OAD LLC agrees to consult with The Distributor or with a committee comprised of distributors prior to making a pricing change.

5.01    OAD LLC shall supply to The Distributor as part of the Initial Fee a quantity of 100 OAD brochures for start-up purposes.   All promotional and advertising material developed by The Distributor, to promote or market the OAD Program shall require the prior written consent of OAD LLC.

6.01    OAD LLC covenants and agrees to train sales representatives or agents of The Distributor in the use of, and in improvements, modifications, extensions or substitutions for the existing OAD Program or any component thereof, the methods and means of such training to be at the discretion of OAD LLC.  The Distributor shall pay for the travel, meal, and lodging costs only of the OAD LLC trainer.

6.02    OAD LLC shall provide to The Distributor as part of the Initial Fee, a 3 day training program in the OAD Program at a mutually agreeable time for a maximum of five employees of The Distributor.

6.03    OAD LLC covenants and agrees that it will not enter into any agreements to distribute its products or services to any officer, director or employee of The Distributor while associated with or employed by The Distributor or for a period of twelve months following their termination or disassociation with The Distributor, unless agreed to by The Distributor.

7.01    The Distributor covenants and agrees to pay to OAD LLC an initial one-time fee (The Initial Fee) in the amount of 0.00 Dollars upon execution of this Agreement.

This payment is to cover OAD LLC's costs associated with the initial training to be provided by OAD LLC to The Distributor and for an initial supply of OAD Program materials as outlined in Appendix B, and is not a payment for rights, and accordingly no right shall accrue to The Distributor under this

4

Agreement, except as expressly provided for herein.

8.01    The Distributor covenants and agrees to pay OAD LLC periodic fees during the term of this Agreement, as follows:

(a)    A royalty in the amount of Twenty (20%) percent of all amounts earned, by The Distributor of a client Annual Retainer. Additionally, 20% of Distributor billings relating to or arising out of the OAD Program save and except amounts arising directly out of material purchases.

(b)    It is understood and agreed that all of the said royalties owed to OAD LLC shall be due and payable no later than the tenth day of the month following the month in which such monies are received by The Distributor. It is further understood and agreed that The Distributor will adhere to all terms and conditions established by OAD LLC for the services to be provided. The Distributor shall provide OAD LLC with particulars of all other OAD related services performed for clients, including particulars of all Management Seminars held.

8.02    The Distributor covenants and agrees that OAD Program Demonstration Disks provided by OAD LLCLLC will be used solely by The Distributor and solely for the purposes of demonstrating the OAD Program to prospective clients and for scoring OAD Surveys for client organizations for use within OAD Management Seminars, and that such disks will not be used for any commercial or revenue generating purpose. It is understood and agreed by The Distributor that the database records produced by the Demonstration Disks are to be saved and that a copy of such records may be requested by OAD LLC from time to time.

8.03    The Distributor covenants and agrees that all purchase orders of OAD Replacement Seminar Kits, for either replacement purposes or for distribution to individuals trained in similar assessment Programs, will require the approval of OAD LLC prior to shipment, and will not be used as substitutes for the OAD Management Seminar Kits in a training seminar.

8.04    The Distributor covenants and agrees to pay OAD LLC for all material purchases within 30 days from the date of invoicing, and to pay any freight or delivery charges on material orders of less than $1000.

9.01    The Distributor covenants and agrees as follows:

(a)    To use its best efforts in furthering and expanding the sale and distribution of the OAD Program within the Territory and to actively and diligently pursue the sale and distribution of the OAD Program within the Territory;

5

(b)    During the term of this Agreement, not to use, sell, teach or service any personnel assessment or testing Program, technique or service similar to or competitive with the OAD Program;

(c)    To use, sell, teach or service the OAD Program or parts thereof only to or for the bona fide businesses for use in the usual course of their business and not to knowingly use, sell, teach or service the OAD Program or component parts thereof to or for any business which intends to violate or does violate any terms of its client agreement or to or for any business whose OAD-trained users violate or intend to violate the seminar agreement; OAD LLC nor its Distributors shall sell the OAD Program to a placement agency unless specific written conditions are arrived at.

(d)    The Distributor shall not use or permit the use in connection with the OAD Program of any forms, training course outline or notes or other material except as supplied by OAD LLC or as otherwise agreed upon by the parties; and shall not change, copy or reproduce, nor allow others to change, copy or reproduce from any form or other document or paper, or part thereof, forming part of the said OAD Program without obtaining on each occasion the permission in writing of OAD LLC;

(e)    To keep accurate records, books, and accounts of all business done by it of the OAD Program or component parts and to make available such accounts as may be necessary for the determination by OAD LLC or its agents of the total value of all sales of OAD or component parts thereof made by The Distributor;

(f)    That all contracts with clients for the sale, training or servicing or any other activities in connection with the OAD Program shall be executed on standard client agreement and seminar agreement forms as provided or approved by OAD LLC and to provide a duly executed copy of each such agreement to OAD LLC;

(g)    That each person enrolled and trained in the OAD Management Seminar shall, prior to conclusion of the seminar, execute a standard seminar agreement form as provided for herein, and to provide an original copy of such agreement to OAD LLC;

(h)    Not to assume or create any obligation, express or implied, on behalf of OAD LLC;

(i)    To train in the use of the OAD Program only bona fide employees of companies to whom it has sold the said Program under a contract in writing on the forms herein before referred to and to report monthly to OAD LLC

6

the name and address of each person so trained, together with the name and address of such person's employer, and to report monthly to OAD LLC the name and address of each client who commences or terminates a client agreement with The Distributor;

(j)     To sell the OAD Program to any business organization or company within the Territory save and except any employment agency, company or consultant in recruiting, search, or placement services; any company, agency, organization or individual providing or offering services in personnel evaluation or assessment of psychological testing or measurement of any kind; or management training, sales training or organization analysis or morale or attitude surveys or personal or vocational counseling or similar services of any kind; nor shall any use of the OAD Program by any such company, agency or individual be permitted by OAD LLC;

(k)     The Distributor agrees to sell the OAD Program only to the parties who have entered into client agreements and not to any individual and acknowledges that OAD LLC will authorize the use of its materials only by parties who have entered into client agreements, and not by any individuals.

10.01 The Distributor covenants and agrees to report in writing OAD LLC monthly of all services and materials sold by it and to keep in a manner satisfactory to OAD LLC accurate and complete records showing the sale of such services and materials including client names, client contacts, and employees trained. The same shall be available for inspection by representatives of OAD LLC from time to time and The Distributor shall provide OAD LLC with copies of such records, including original signed contracts as required by OAD LLC at its sole discretion. The Distributor shall complete and file with OAD LLC a monthly Sales Service Advisory Report provided by OAD LLC on or before the 10th day of the month with respect to its sales activities during the preceding month.

11.01     Notwithstanding anything in this Agreement, other OAD LLC Distributors shall be permitted to sell new business to companies based in the Territory, and The Distributor shall be permitted to sell new business to companies located in other territories.

11.02     OAD LLC shall refer to The Distributor all sales leads, enquiries, and names of identified prospects located in the Territory; if more than one distributor exists in the Territory, leads will be distributed either to the distributor best qualified to service the prospective client's business.

12.01     The term of this Agreement shall be for a period of Three (3) years following the date of execution hereof, and at the end of that time period shall renew automatically from year to year for a further term of one (1) year unless

7

terminated as otherwise provided for herein.

12.02 This Agreement may be terminated:

(a)    By OAD LLC at the expiration of any year during the term of this Agreement, in the event the minimum purchases of OAD Program materials (training kits and software) by The Distributor are less than:

i)    During the first year of the term of this Agreement, the sum of Sixteen Thousand Dollars ($16,000.00);

ii)    During the second year of the term of this Agreement, the sum of Twenty-Five Thousand Dollars ($25,000.00);

iii)    During the third year of the term of this Agreement, the sum of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00); and

iv)    During the fourth year of the term of this Agreement, or thereafter, the sum of Fifty-Five Thousand Dollars ($55,000.00).

(c)    By either party giving immediate declaration of termination of the Agreement in the event the other party shall default in the observance or performance of any written covenant or undertaking contained herein and shall fail to correct the default within a period of Fifteen (15) days after notice of such default has been given by the other party in accordance with the provisions of this Agreement;

(d)    By either party giving immediate declaration of termination of the Agreement if an order shall be made or an effective resolution be passed for the winding up or liquidation of the other party, or the other party shall make a general assignment for the benefit of its creditors or files for bankruptcy or shall be declared bankrupt; or

(e)    By OAD LLC giving immediate declaration of termination of the Agreement if The Distributor or any of its majority stockholders, directors, employees or representatives is involved in any act of conduct which materially impairs the goodwill associated with OAD LLC, the OAD proprietary marks or materials.

12.03    In the event of termination of this Agreement:

(a)    The Distributor shall forthwith return to OAD LLC any and all unused OAD Program software disks and other materials in its possession, including all OAD Organization Surveys, JAX Questionnaires, training

8

materials, and all other written materials, pertaining to or relating to the OAD Program, whether or not provided to The Distributor by OAD LLC and upon return of all such material, OAD LLC shall refund to The Distributor the price paid by The Distributor for the OAD disks Program and training kits; and

(b)    Provided The Distributor does not violate the provisions of Article 13 of this Agreement, then OAD LLC will pay to The Distributor a sum equal to Twenty-Five (25%) percent of the client price for each OAD software disk purchased and paid for by those clients of OAD LLC who were sold the OAD Program by the Distributor during the term of this Agreement.  It is understood and agreed that such payments to be paid to the Distributor shall only be made as and when the payments are received from such clients, shall only be payable for a period of one year following termination of the Agreement, and shall only be payable in the event the Agreement is terminated by OAD LLC given Ninety (90) days' notice in writing to The Distributor of its wish to terminate the Agreement.

13.01    The Distributor acknowledges that the OAD Program and all other trade secrets, know-how, confidential information, and technical information relating thereto disclosed to the Distributor pursuant to this Agreement, has been disclosed to it in the strictest of confidence and accordingly, the Distributor hereby covenants and agrees that it will not, either during the term of this Agreement, or at any time thereafter, disclose any such information with respect to the OAD Program that it may obtain from OAD LLC pursuant to this Agreement, nor will it for its own purposes or for any other purposes, disclose to anyone, any information or knowledge it may acquire with respect to the business affairs of OAD LLC.  Each director, officer, and employee of the Distributor shall, as a condition of employment, enter into a covenant similar to the foregoing covenant in favor of OAD LLC and prior to commencement of employment, a duly executed copy of such covenant shall be delivered to OAD LLC.

13.02    Upon termination of this Agreement for any reason, the Distributor covenants and agrees that it will not solicit, directly or indirectly, any party who was a client of OAD LLC at any time during the Twelve (12) months preceding the date of termination for the purpose of selling to such person a personnel assessment or evaluation Program similar to or competitive with the OAD Program.  A covenant similar to the foregoing covenant in favor of OAD LLC shall be executed and delivered to OAD LLC by each and every director, officer, and employee of the Distributor.

14.01    Nothing in this Agreement shall be construed to create a relationship of partners, joint ventures, fiduciaries, or any other similar relationship between the parties.  Nothing herein shall be deemed to authorize the Distributor the right or authority to assume or to create any obligation or

9

responsibility, express or implied, on behalf of or in the name of OAD LLC or to bind OAD LLC in any manner or thing whatsoever.

14.02    This Agreement shall not be transferred or assigned by The Distributor hereto without OAD LLC's prior written consent and approval, which shall not be unreasonably withheld. In the event of an assignment, the assignee will be required to fulfill The Distributor's obligations under this Agreement. It is understood and agreed that a transfer and/or issue of shares in the capital stock of The Distributor giving an effective change in the voting control of The Distributor shall be deemed to be an assignment of this Agreement requiring the consent and approval of OAD LLC.

14.03    OAD LLC covenants and warrants that the author of the OAD Organization Survey and OAD Program is the rightful owner, and has no obligations whatsoever to any third parties. OAD LLC further covenants and warrants that the OAD Organization Survey and OAD Program do not infringe or violate any copyright or proprietary or personal right of any party. In event of a breach of this warranty, then OAD LLC will indemnify and save harmless The Distributor from claims, suits or actions arising out of that breach.

14.04    The Distributor agrees to adhere to all OAD LLC marketing and sales policies and to make no false claims or representations concerning the purpose, the capabilities or any features or attributes of the OAD Program. The Distributor further agrees to hold harmless and to indemnify OAD LLC against any claim, suit, action or proceeding arising out of any false claims or representations made by The Distributor or its representatives.

14.05    This Agreement shall be constructed in accordance with and governed by the laws of the State of Massachusetts, and only the courts of the said State of Massachusetts shall have jurisdiction in any matter arising under or out of this Agreement.

14.06    This Agreement constitutes the entire agreement between the parties and it is expressly understood and agreed that there are no representations, promises or agreements between the parties, oral or otherwise, not embodied herein.

14.07    The covenants, warranties and representations herein shall survive the termination of this Agreement.

14.08    The failure of either party to enforce the provisions hereof any time shall not be construed to be a waiver of such provisions or of the right of such party thereafter to enforce any such provisions.

14.09    This Agreement cancels and supercedes all prior agreements between the

10

parties in respect to the subject matter hereof.

14.10    Sydney, Inc. hereby guarantees the due and faithful performance of The Distributor of each and every covenant on the part of The Distributor contained herein as though each and every covenant were a covenant of The Guarantor.


IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed

This 18th day of July, 2002


Organization Analysis and Design a Limited Liability Corporation

                                                        WITNESSED BY

By:                                                     

    Michael J. Gray

          WITNESSED BY

By:

    Your name

11

# APPENDIX A
## OAD MATERIALS AND PRICES
### June 2002

1. MINIMUM CLIENT PRICES:

    OAD Disks:

| | |
|---|---|
| 50 Scorings | $1,100. |
| 100 Scorings | $1,700. |
| 250 Scorings | $3,500. |
| 500 Scorings | $4,500. |

    OAD Organization Surveys (package of 100)    $50.

    OAD Management Seminar - per participant    $950.

    OAD Client Retainers

| | |
|---|---|
| 1 - 50 Employees | $750. |
| 51 - 100 Employees | $1200. |
| 101 - 250 Employees | $2000. |
| 251 - 500 Employees | $3000. |

2. OAD MATERIAL PRICES TO DISTRIBUTORS

    OAD Disks:

| | |
|---|---|
| 50 Scorings | $ 440. |
| 100 Scorings | $ 680. |
| 250 Scorings | $1,400. |
| 500 Scorings | $1,800. |

    Demonstration Disks (250 scorings)    $100.

    OAD Management Seminar Kits - each    $315.

    OAD Replacement Seminar Kits    $65.

OAD Organization Surveys (package of 50)    $8.

OAD Program Brochures (package of 50)    $15.

12

## APPENDIX B

### MATERIALS AND SERVICES - INITIAL FEE

#### June 2002

The OAD Distributor pays an Initial Fee to cover the materials and training necessary to begin selling and servicing the OAD Program. Included in the Initial Fee are the following:

1. Five days of training for up to 5 representatives of the Distributor on training, selling and servicing the OAD Program, to take place in either Boston or Toronto. Travel and other Distributor expenses are not included.

2. One OAD Program disk with 250 OAD scorings and 300 OAD Organization Survey forms.

3. 100 OAD program brochures.

4. One set of OAD Management Seminar facilitation materials, including training manual and overhead transparencies.